MEMORANDUM OF DECISION
On March 23, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Laurie G. and David A. to their two children, David, Jr. and Andrew. David is now four and Andrew is three years old. DCF became involved with the family when Laurie and David fought in the home over David's treatment of Laurie's older child, Jesse. After the arrest of the parents, DCF offered in- home services to the parents. Despite the offered services, on April 20, 1995, DCF invoked a ninety six hour hold and then secured an order of temporary custody when David was reported by the Visiting Nurse Association on April 19, 1995 to be a "failure to thrive" baby at age six months, and when he received second CT Page 14536 degree burns on his feet after being left unattended near a home heater on April 20, 1995. His half-brother Jesse was also removed at that time. David's younger brother, Andrew, was born later that year on October 31, 1995. Because the parents had not dealt with their housing, domestic violence and parenting issues, Andrew was removed from the hospital and has never been in the care of either parent.
On June 27, 1996, both David, Jr. and Andrew were adjudicated neglected and committed to the care and custody of DCF. Their commitments have been extended twice since that date. On March 23, 1998, DCF filed the present termination of parental rights petitions, alleging that the children had been abandoned by their parents and that their parents had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, they could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(A) and (B). On December 14, 1998, trial on the petitions commenced. David A. did not attend the trial and was not represented by counsel. Laurie G. also did not attend the trial, although her counsel was hopeful, in view of messages left with his office, that she would attend the next day. The trial continued on December 15, 1998 and Laurie G. failed to attend, although her counsel vigorously contested the petitions. From the evidence presented, the court finds the following facts:
 A. FACTS
1. Events in the home prior to the removal of David A.,Jr.
Laurie G., David's mother, was married at age sixteen to Quentin G., the father of her oldest child, Jesse. She remained with her husband only a short period of time and returned to Iowa to live with her own mother. Approximately a year later, she met David A. and in 1994, she and David moved to Connecticut to be with his family. David A., Jr. was born on October 27, 1994 whiIe Laurie and David lived together with David's parents. On February 9, 1995, the police were summoned to the home when David and Laurie had an argument about David's hitting Jesse, then three years old, because Jesse was noisy while eating breakfast. Laurie and David then began hitting and scratching each other and were both arrested. The next day, Trooper Lenda testified, when he went back to the home to check on the child, he could not gain CT Page 14537 access to the house until he summoned backup troopers. David was belligerent and "it took a lot of talking to calm him down." Trooper Lenda stated that David did not like authority and did not want to be told what to do."
Laurie, with the help and encouragement of DCF, spent the next seven days in shelters. She was moved from one shelter to the other when it was discovered that wires in her car were cut. At the second shelter, Laurie left the baby David unattended twice; once on a table top and once in a corner of the room with blankets piled over him. When the shelter workers spoke to her about this, she called David to come and get her, meanwhile divulging the confidential location of the shelter.
The next step DCF took was to enter into a service agreement with Laurie to protect the children.[2] While Laurie signed the one presented to her, David refused to sign a service agreement which required him to refrain from using physical discipline with the children. Heather Hurley, the DCF treatment social worker, testified that DCF arranged for intensive family preservation services in the home to assess the parents, to teach them some parenting skills and to begin to deal with their domestic violence. DCF became aware through its discussions with the mother that things were not going well for her in the home, as Laurie received no cooperation from David or the grandparents.
Not only did David A. not like anyone telling him what to do, his entire family did not want DCF involved or visiting the home. The intensive family preservation workers were treated poorly and worked in a hostile environment. Visits were difficult to arrange and only Laurie cooperated. David would not cooperate in any fashion; he was not in the home during the home visits and never agreed to any of the services offered.
A report by the United Community Services worker and her assistant dated April 20, 1998 provides a glimpse into a chaotic and intolerant household, where Laurie and her children occupied rooms in the basement only on sufferance.[3] When the social work intern arrived at the home, one of David's sisters was there with three dogs. She yelled at Jesse and called him a "brat." Then she started to yell at Laurie and wanted to know why these people were in her house. She and the grandfather apparently had never been informed about the intensive family preservation services and were very angry about it. After the worker spoke with the grandfather, who yelled at her over the phone, and the CT Page 14538 aunt continued to yell at Laurie, to add insult to injury, one of the dogs bit the worker on the arm. Then Laurie began to yell and curse at the aunt. The baby, David, Jr., whose feet had been badly burned the night before, began to cry uncontrollably and the three year old, Jessie, began to yell at the aunt after she had said more negative things about him.
The day before this home visit and referral finding that both Jesse and David, Jr. were at risk because they were living in an unsafe, chaotic and unnurturing environment, DCF had received a referral from the Visiting Nurse Association about David, Jr. The nurse who visited the home determined that David, then six months old, was a "failure to thrive" baby. He weighed only thirteen pounds. In addition to that referral, the evening of April 19, 1995, David, Jr. was treated in the hospital for second degree burns on his feet, for which his mother gave inconsistent explanations. She stated, according to Ms. Hurley's testimony, that when she was making the bed she placed the baby on the floor and somehow the space heater, which perhaps his brother had turned on, was on and David's feet were in between the prongs on the heater and badly burned. While none of the physicians treating the child concluded that the child was intentionally burned and no determination could be made as to how the injury came about, it was one more element in DCF's awareness of this family's inability to adequately care for the children.
As a result of the parenting concerns and the referrals, DCF invoked a ninety-six hour hold, came to the home with the police and removed both Jesse and David. The DCF worker testified that Laurie was oddly unemotional about it all. She was "more concerned about how the rest of the family would react and whether she would be blamed for it." Ms. Hurley had previously told Laurie that DCF would be filing neglect petitions. She concluded from Laurie's reactions that Laurie was not motivated to improve her situation. Laurie also did not ask many questions about what she needed to do to get the children back.
2. Events following the removal of David, Jr. untilAugust 1997
In the months that followed the removal of the children, David A. did not cooperate with DCF at all. He was belligerent, obnoxious and threatening and never addressed the issues which caused the removal of David from his home and subsequently of Andrew, his younger son. And while Laurie appeared to be CT Page 14539 accepting the services offered, in the end, she, too, did not cooperate with the referrals that were made and services offered.
One such referral was to the Colchester Youth and Family Services for counseling and mental health services and for financial assistance so that other housing could be obtained. This facility was close to where Laurie was living and accessible to her. But she either stated she lost the number or had not yet called. The end result was that she never utilized the services. Another referral was to the Child and Family Agency for a family violence program. Both David and Laurie could have received counseling for their couples issues and then moved on to parenting issues there. But as David would not sign releases, he never participated. While Laurie attended some sessions and had visitation with David there once a week with the counselor for a period of time, by February of 1996, she had stopped attending. Laurie reported that she did not need counseling. In March of 1996, she was discharged from the program and never attended any other services to which she was referred except one parenting session at Madonna Place.
On October 31, 1995, Andrew was born. Because neither parent had begun to deal with the parenting and personal failures which led to the removal of David, Jr. in April of that year and because they were both still residing in the household with the grandparents and other family members, DCF determined it was not safe to permit Andrew to remain in his parent's care.
Visitation was initially permitted to Laurie three days a week and she did visit frequently for a considerable period of time. Nonetheless, many of those visits exhibit the unusual parenting behaviors[4] that Dr. Richard Sadler, the psychiatrist who evaluated David, Laurie and David Jr., noted at the time of his evaluation in August of 1996. Dr. Sadler stated:
 "It is my observation that the impairments in the parenting relationship are relatively subtle yet still profound. Both parents, by my observation, demonstrate emotional distance from the child and neither parent has demonstrated a firm emotional connection to or adequate parental responsibility toward Jesse. . . In my opinion, neither Ms. G. nor Mr. A. is capable, at this time, of providing minimally adequate care for an infant."
Dr. Sadler also noted that "the relationship between Ms. G. and CT Page 14540 the paternal grandparents and Mr. A. appears to be severely troubled and it diminishes Ms. G.'s ability to care for her child." In his evaluation, he held out hope for Laurie's rehabilitation as a parent, as he believed that with adequate support and supervision, she might be capable of developing adequate nurturing abilities.
In Dr. Sadler's testimony at trial, he was aware of the present circumstances of the family and stated that there were no indications that Laurie had begun to make the changes necessary to parent the children. He stated that in his opinion at the time of his evaluation in 1995, Laurie had a poor ability to protect her children. He recalled that Laurie did not in 1995 appear to be bonded to David and that their back-and-forth interactions were unusual and did not reflect the intimate connected eye-to-eye contact ordinarily expected of an infant and a mother.
2. Move to Iowa
 A. Laurie G.
But whatever level of visitation and the interactions between Laurie, David, Jr. and Andrew had existed in the past, events have overtaken this family and reduced their contact with each other. In late August, 1997, Laurie came to the DCF office and informed the program supervisor that David was returning to his wife and four other children who resided in Iowa. As a result, she had to leave the residence of his family in Connecticut. She also admitted that she was pregnant with her third child by David A. and asked whether or not DCF would take that child from her at birth. DCF attempted to find shelters for her to stay within the state so that she could continue to visit with her children in their placements. But Laurie returned to Iowa to live with her mother. Her baby was born there and she continues to reside with her mother, her younger brother and the new infant in Iowa. She had some sporadic contact with David, Jr. and Andrew by telephone during the first few months after she left. But since January, 1998, there has been no contact; no cards, letters, gifts or inquiries about their welfare. In July, 1998, Laurie was in Connecticut for further court proceedings and requested visitation with the boys. DCF denied her request because of her long absence from the boys' lives.
In October, 1997, through the Interstate Compact, DCF CT Page 14541 requested information from Iowa concerning Laurie and her status there. A home study was performed and a records review of her past history with the child protection agency.[5] The past history was consistent with Laurie's history in Connecticut of a failure to accept services and attend scheduled appointments. The home study did not recommend that the children be returned to her. There was no further information concerning Laurie's rehabilitative efforts except that the report noted that she appears not to have accepted responsibility for the problems that caused the removal of her children by DCF.
B. David A.
David A. also resides in Iowa, and as far as is known, with his wife, Theresa, and their four children. He has had no contact with his two children in Connecticut, nor sent cards, letters, or gifts or inquired about their welfare. While in Connecticut prior to August of 1997, his visitation with them was minimal. In the thirteen months following Andrew's birth in 1995, he visited a total of 12 times when visitation was offered 3 times a week and there were a total of four months where he visited not at all. He failed to participate in any services to address the issues of domestic violence, individual counseling as recommended by Dr. Sadler or any parenting concerns.
Dr. Sadler evaluated David A. in 1995, when David was already undecided whether to remain with Laurie in Connecticut or to return to his wife and four children in Iowa. Dr. Sadler stated:
 "David A. is . . . an intellectually average man with a chronic characterological defect. Mr. A. has lived his life strictly in accordance with his own desires and wishes with a nearly complete disregard of its effects on others and is considered by me to be a serious psychiatrically impaired, and characterologically disordered young man who was neglectful and abusive to his son and to Ms. G."
His conduct since 1995 has amply demonstrated this assessment. In the years since, he has fathered two more children with Laurie G., and abandoned them all for a wife and four children he had abandoned earlier.
4. The Children
CT Page 14542
Unfortunately for David, Jr. and Andrew, their removal from their parents was not been without its own difficulties. The hope for a permanent placement shortly after removal from their biological parents did not become a reality for them and their opportunity for stability in a nurturing and consistent home has remained elusive. David has had five foster home placements since he became a foster child. In the last such placement, he was apparently sexually abused by the foster father and is now in treatment. He remains with the foster mother, who took appropriate action to protect this child. He and Andrew enjoy each other's company and have a close sibling bond. His therapist testified that David is making good progress. While David's relationship to his foster mother is not the focus of the therapy, they "are mutually warm with each other, the mood is happy and the affect is bright, "Ms. Stackpole testified. He has a bond and strong attachment to his present foster mother, with whom he has lived since March, 1997. David does not miss his biological mother, Ms. Stackpole determined. In the play therapy she conducts with him, she testified that "things go along fine and then boom, terrible things happen." This sense of his world that David demonstrates reflects what has happened to him in his short life.
Andrew also has not been fortunate in his placements. Nonetheless, he is doing well with his present foster care family. DCF has given some consideration to placing the boys together. There have, apparently, been some overnight visits by David with Andrew. This possible permanency plan and the resulting disruption of David's placement with his present foster mother will be psychologically evaluated, to determine the nature and extent of each boy's attachment to the foster family and each other.
 B. ADJUDICATION
The court finds, by clear and convincing evidence, that as of March 23, 1998, both Laurie G. and David A. have abandoned their two sons, David, Jr. and Andrew. Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re JuvenileAppeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). There can be no doubt that the facts support this ground for termination of parental rights of David A., who has exhibited no interest in his sons. His abandonment of them has existed for CT Page 14543 more than a year prior to the filing of the termination petition.
Laurie's situation is somewhat different. Until her departure from Connecticut, she continued to show some interest, love and affection for her two sons, David, Jr. and Andrew. But her decision to return to Iowa and leave the boys behind made the present situation inevitable. [The abandonment statute] "does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." In reKezia M., 33 Conn. App. 12, 18, 632 A.2d 1122 (1993). "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) In reMichael M., 29 Conn. App. 112, 614 A.2d 832 (1992); In re RaynaM., 13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); In re MigdaliaM., 6 Conn. App. 194, 208-209, 504 A.2d 533 (1986). The court concludes, by the clear and convincing evidence, that Laurie, too, has abandoned her sons.
Also required for adjudication is a finding by the court that either the facts warranting the adjudication have existed for more than one year prior to the filing of the petitions or that under the totality of the circumstances, it is in the best interests of the children that the time period be waived. Connecticut General Statutes § 17a-112(d)(1). Waiver of the one year requirement is within the court's sound discretion. Inre Romance M., 30 Conn. App. 839, 622 A.2d 1047 (1993), In reChristine F., 6 Conn App. 360, 505 A.2d 734 (1986). The waiver is appropriate in this case where Laurie has refused all services and has by her conduct terminated all contact with her sons. Waiting for the time required by the general provisions of the statute to pass would serve no purpose and is not in the best interests of either David, Jr. or Andrew, who both deserve permanency in their lives. The court therefore waives the one year requirement pursuant to Connecticut General Statutes § 17a-112(d)(1).
The court further finds, by clear and convincing evidence, that as of March 23, 1998, neither parent had achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). David A. has directly and with great belligerence refused all services. Laurie has stated her willingness to accept services, but has CT Page 14544 never completed the services to which she was referred and has, through lack of actions failed to cooperate. Neither has begun to address the issues of domestic violence and parenting which led to the removal of their children years ago. Since both have relocated to Iowa and have done nothing to reclaim their children in over a year, there is no reasonable likelihood of the parents' rehabilitation soon. These children cannot wait until some future and indeterminate time for the rehabilitation of their parents, a rehabilitation neither has ever been able to achieve in the past and will not, if ever, achieve for years to come.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., supra, see also; Inre Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). There is no doubt that neither Laurie nor David will be rehabilitated within the foreseeable future. The court finds, based on the clear and convincing evidence, this ground had existed for longer than one year prior to the filing of the termination petitions.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were provided by DCF to the family. Those services include services to benefit the children, domestic violence and individual counseling for the parents at the Child and Family Agency, Intensive Family Preservation, Madonna Place for parenting classes, visitation, transportation and case work services.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. While Laurie appeared willing to participate, she did not participate in services to any meaningful degree. David refused all services. Neither parent began to address the personal and parenting failures which led to the removal of the children.
3) DCF set reasonable and realistic goals for this family. There were service agreements proposed which Laurie signed. But she did not comply with the terms of the agreements in any meaningful way. David never accepted or signed any proposed CT Page 14545 service agreements.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. The children unfortunately have had multiple caretakers, but appear connected to their present foster parents. David, Jr. is not interested in his biological mother and has no connection to his biological father. Andrew, who was placed in foster care at birth, has no such connection.
5) Finding regarding the ages of the children. David, Jr. is four and Andrew is three.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parent has maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. Both Laurie and David have not maintained contact with their children and have been unable to adjust their circumstances to make return of the children to them feasible. They have never begun to rehabilitate from the problems and failures which led to the removal of the children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps to encourage these parents to have a meaningful relationship with the children and to rehabilitate themselves, which they have been unable to accomplish.
 D. DISPOSITION
David, Jr. has been in foster care for over three years as has Andrew. Their parents are no closer now to making the CT Page 14546 necessary personal changes to parent them than they were when each of the boys were removed from their care in 1995. David, Jr. and Andrew retain a close sibling bond and have a connection to their present caretakers. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). The Appellate Court has noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally,JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD99 (1979).
Based upon the foregoing findings, the court finds that it is in the best interests of the children that the rights of their biological parents to them be terminated. The court orders that a termination of parental rights enter with respect to Laurie D. and David A. to David, Jr. and Andrew. The Commissioner of the Department of Children and Families is hereby appointed the children's statutory parent. The court further orders that a permanency plan for David, Jr. and Andrew be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session